No. 46,740

CORNELIUS A. HIEBERT, III., a minor by and through his mother, ELMA F. HIEBERT, *Appellee*, v. MILLERS' MUTUAL INSURANCE ASSOCIATION OF ILLINOIS, *Appellant.*

(510 P. 2d 1203)

Opinion filed June 9, 1973.

*Larry A. Withers*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Roger Sherwood*, of the same firm, was with him on the brief for the appellant.

*Donald R. Newkirk*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is an action by an insured, through his mother, against his liability insurance carrier. It is based on the insurer's refusal to defend and pay a claim against the insured in a wrongful death action. Judgment was entered against the defendant insurance company and it has appealed.

The lawsuit grows out of the death of Allen Young, who was a friend of the plaintiff, Cornelius A. Hiebert, III. Hiebert was employed as a filling-station attendant by Harold M. Heston, d/b/a Heston Gulf Service Station. While engaging in horseplay with Young in and about the station, Hiebert shot and killed his friend. Young's survivors, being his widow and three minor children, filed suit against Gulf Oil Company, U. S. A., Harold M. Heston, the station operator and Elma F. Hiebert, mother and next friend of Cornelius A. Hiebert, III, a minor. Gulf Oil Company was later dismissed from the lawsuit.

At the time of the fatal shooting Hiebert was an insured under the provisions of a homeowner's liability policy issued to his mother by Millers' Mutual Insurance Association of Illinois, hereafter referred to as the defendant, or Millers' Mutual. This policy excluded "any business pursuits of an assured." On the other hand Heston had a garage liability policy with Travelers Indemnity Company, herein called Travelers. Coverage was extended under this policy to any employee of Heston, the named insured, "while acting within the scope of his duties as such." Both insurance carriers disclaimed liability under their respective policies but Travelers afforded Hiebert a defense to the action, while Millers' Mutual did not.

After suit was filed, settlement negotiations were commenced by Travelers in which Millers' Mutual resolutely refused to join. As a result of the negotiations the Youngs ultimately agreed to accept $25,000 in settlement of their claim. This offer was communicated to Millers' Mutual by counsel representing Heston and Hiebert. Millers' Mutual continued to disclaim liability, as it had done all along, and declined to participate in any settlement, in any way. The negotiations between Travelers and the Youngs eventually culminated in a friendly hearing before the court on March 2, 1971, at which time the parties announced they were ready to proceed to trial, waived a trial by jury, advised the court they desired to present evidence, and announced that subject to the court's findings and conclusions, the court might enter an agreed judgment.

After hearing plaintiff's evidence, which included testimony by the defendants, the court found that Young was accidentally killed by Hiebert as a result of negligence on Hiebert's part while engaging in horseplay; that Heston was not guilty of any negligence

which was a proximate cause of Young's death; that at the time of the accident Hiebert was not acting as an agent or employee of Heston within the scope of his employment; and that Hiebert's negligent conduct did not arise out of or in the course of his employment by Heston. The court also found that $25,000 was a fair and adequate sum to compensate the plaintiffs for their loss. The court entered judgment in favor of Heston, and rendered judgment against Hiebert, in the sum of $25,000. The court further decreed that funds received by the clerk in satisfaction of the judgment be held pending a ruling on the apportionment of the recovery, as provided in K. S. A. 60-1905.

The $25,000 judgment against Hiebert was entered March 2, 1971. On March 12, 1971, Hiebert executed a loan receipt reading as follows:

"For Value Received, I hereby promise to pay Travelers Insurance Company, a corporation, of Hartford, Connecticut, the sum of Twenty-Five Thousand Dollars ($25,000.00) with eight percent (8%) interest from March 1, 1971. The payment of said sum shall be payable only out of any recovery had by me against the Millers Mutual Insurance Ass'n. of Illinois. In addition, I agree to prosecute my claim against the Millers Mutual Insurance Ass'n. of Illinois, with due diligence, in my own name, and agree to appear at all necessary trials, and have my personal attorney cooperate with counsel for The Travelers Insurance Company.

"Dated this 12 day of March, 1971, at Wichita, Kansas.

/s/ Cornelius Hiebert
Cornelius Hiebert, III

Approved

/s/ Elma F. Hiebert
Elma F. Hiebert, His Mother
and Natural Guardian

"Witness:
/s/ Donald R. Newkirk"

It is agreed that Travelers provided Hiebert the funds with which to pay the $25,000 judgment entered in the wrongful death suit.

The present action was commenced by Hiebert May 28, 1971, and seeks recovery of $25,000, plus interest, costs, and a reasonable attorney's fee. Facts were either stipulated or established by exhibits. Judgment was entered against Miller's Mutual for $25,000, plus 8 percent interest from March 1, 1971, the approximate date of the judgment against Hiebert, plus $2000 attorney's fees.

Findings made by the trial court in the present case are as follows:

"1. That defendant is bound by the findings made in the journal entry filed in Case C-19543 wherein the Court found that the death of Young was the result of the negligence of Hiebert while engaged in horseplay, that Hiebert was not acting as an employee of Heston nor within the scope of his employment nor was the death incidental to his employment nor did the death relate directly or indirectly to the business pursuits of either Hiebert or Heston.

"2. That Cornelius A. Hiebert, III, a minor, by and through his mother, Elma F. Hiebert, is the real party in interest in the present litigation.

"3. That Hiebert was insured by the homeowner's policy of defendant, Policy No. 3-11349, as to the claim for the wrongful death of Young.

"4. That defendant breached its contract by its failure to defend and settle or pay any adverse judgment against Hiebert within the limits of the coverage afforded him by its policy.

"5. That a loan receipt transaction is valid in the State of Kansas.

"6. That defendant was not relieved of providing coverage or defense to Hiebert under its 'business pursuit' exclusion in its policy.

"7. That plaintiff has been damaged by defendant's breach of contract in the amount of $25,000.00 plus interest at eight per cent from March 1, 1971."

At a separate hearing on plaintiff's application for allowance of attorney's fees the trial court found that the defendant had "refused without just cause or excuse to pay the amount of judgment for which plaintiff is entitled to attorney fees in the amount of $2,000.00."

The defendant expresses the principal issue as being whether Travelers can maintain this action in Hiebert's name under the guise of a loan receipt. The two underlying questions, it continues, are whether the loan receipt transaction is void as against public policy and whether Millers' Mutual has standing to challenge its validity. Those questions are somewhat commingled in the defendant's presentation.

Before proceeding to discuss the matters raised, a brief glance at the origins of the loan receipt device and the background against which it came into use may prove helpful in understanding the problems which led to its employment in the present situation.

We can do no better in tracing or developing the background than by quoting from the annotation, Insurance—Loan Receipts, 13 ALR 3d 42, at page 48:

"The loan receipt device appears to have had its origin in the struggle between common carriers and insurers to shift the burden of a loss upon the other, resulting from the practice of the carriers of inserting in their bills of lading a provision that they should have the benefit of any insurance carried by the shipper and the countering move by marine and inland marine insurers of inserting in their policies issued to a shipper stipulations that they would not be liable for any loss for which the carrier was liable or where the bill of lading contained a stipulation that the carrier might have the benefit of any insurance on the cargo, and that the insured would make no agreement and

do no act whereby the insurer's right of action against the carrier might be affected. In the face of such opposing provisions, a shipper whose cargo had been damaged or destroyed, and who was entitled to prompt settlement of his loss either from the carrier or the insurer, might be out of funds until final adjudication of an action by him against the carrier determining whether the carrier was liable. To avoid depriving the shipper of the use of funds pending such determination, and to keep alive the carrier's liability and prevent the inequitable shifting of a burden which was rightfully the carrier's to the shipper's insurer, the insurers devised the loan receipt."

Although the loan receipt device may originally have been conceived to ameliorate the lot of the commercial shipper who was squeezed between the conflicting claims of the common carrier on the one hand, and his own insurer on the other, its use expanded into the area of disputes between competing insurance carriers as to which insurer might be liable for payment of a particular loss. As was pointed out by counsel upon oral argument, the loan receipt concept permits an insured to be paid for its loss leaving the matter of coverage between insurers to be determined later at their own pace and own expense. It can doubtless be a useful tool in settlement and payment of the claims of policyholders who might otherwise have to cool their heels awaiting the outcome of litigation between their quarreling insurance carriers.

Loan transactions evidenced by loan receipts similar to the one used in this case have generally, if not universally, been held to be valid as true loans where the obligation or liability of the insurer advancing or lending the money was not absolute but was contingent, conditional, excess or undetermined. This rule is expressed in 13 A. L. R. 3d Insurance—Loan Receipts, pp. 49-51:

". . . Loan receipt transactions have uniformly been held to constitute valid loans in all cases where the insurer's liability was in any way contingent, thereby fitting into the factual pattern of the Luckenbach Case, as where its liability was contingent upon nonliability of a carrier, or limited to a pro rata portion of the loss or to excess insurance, or contingent upon the nonexistence of other insurance. There is a divergence of opinion, however, as to whether a loan receipt transaction constitutes a valid loan where the insurer's liability is absolute. . . . The primary effect of a loan receipt is to keep alive a third person's liability to the insured for the loss and to permit an action against such third person to be prosecuted in the insured's name, because where the transaction is deemed a valid loan and not a payment of the insurer's liability to its insured, the insurer is not subrogated to the insured's rights against third persons, subrogation to such rights taking place only where the transaction is regarded as a subterfuge and the payment thereunder held to constitute a discharge of the insurer's obligation. . . .

". . . In those federal cases wherein ownership of the substantive right of action was determined under state substantive law and Rule 17 (a) then

applied, it has been held that where under the state substantive law the loan receipt transaction, whether covering all or only a portion of the loss, was deemed a true loan and the insured retained ownership of the right of action, there being no subrogation, the insured was the real party in interest under Rule 17 (*a*) and the proper party plaintiff in an action against third persons, that the insurer was not a real party in interest required to be joined, and that it could not maintain an action in its own name. . . ."

In the cases which defendant has cited as contravening the rule, the liability of the carrier appears to have been fixed or absolute; not contingent or uncertain, as was Travelers' in the instant situation.

The present case appears to fit neatly into the general rule. While there may have been little or no doubt as to Hiebert's liability under the wrongful death statute, the question of coverage as between the two insurance carriers was contingent and undetermined. If Hiebert was acting within the scope of his employment at the time of the shooting, Travelers' garage policy would provide coverage; if Hiebert was not so acting, he was not covered by Travelers and would have to look elsewhere, *i. e.*, to Millers' Mutual, whose policy excluded business activities of an assured.

Prior decisions of this court can be said to be in general accord with the prevailing rule and to support the plaintiff in his position.

In *Gibbs v. Central Surety & Ins. Corp.*, 163 Kan. 252, 181 P. 2d 498, the plaintiff, Gibbs, while driving a car belonging to Blackwell struck and injured a bicycle rider. Central Surety carried liability insurance on Blackwell's car but it refused to recognize any responsibility under its policy. Gibbs proceeded to negotiate a settlement himself, aided by an investigator and an attorney, after first notifying the defendant company as to the terms of the proposed settlement. He then sued the defaulting insurer for refusal to investigate the accident and to extend coverage under its policy. The money to make the settlement was furnished Gibbs, so the record shows, by his own insurance carrier under a loan agreement.

The trial court entered judgment for the defendant insurance company. In reversing the judgment on appeal this court said:

"The next question presented is whether the fact that money was indirectly furnished Gibbs to pay Nelson results in a conclusion that no loss was sustained by Gibbs and therefore he may not recover. This question cannot be entirely dissociated from that previously discussed, under the situation disclosed by the pleadings and evidence, but we need not pursue this aspect of the matter for the reason that the source of payment, if made in good faith, is immaterial to the insurer and cannot be inquired into, and that the payment may be made with borrowed money is no defense. (Citing cases.) That Gibbs paid Nelson $875 stands entirely undisputed, and that this amount represents a loss sustained by Gibbs cannot be gainsaid." (p. 259.)

In the later case of *Hoffine v. Standard Accident Ins. Co.*, 191 Kan. 63, 379 P. 2d 246, much the same situation prevailed. Hoffine, the plaintiff, was insured by the defendant, Standard Accident Insurance Company, under a family combination automobile policy. While so insured, and while driving a Cadillac owned by Schuessler, who was insured by Employers Mutual Casualty Company, he rear-ended another car, driven by Carr. Mr. Carr sued Hoffine, but Standard Accident, Hoffine's own insurer, took the position it was not required to defend Hoffine under its policy or contribute to a settlement. A settlement was negotiated between Carr and Hoffine which was fully disclosed to the defendant, and the defendant was notified that Hoffine would look to it for recovery of the amount which had been paid, plus attorney fees.

Employers Mutual, Schuessler's insurer, furnished Hoffine the money to pay Carr's judgment and Hoffine, in return, executed a loan receipt to Employers Mutual identical in form to the receipt executed in this case by Hiebert. The trial court sustained a demurrer to plaintiff's evidence. In reversing the judgment this court relied on and quoted from the *Gibbs* opinion. The holding in *Hoffine* is expressed in Syllabus 4:

"Where a person is insured under a liability policy, and in good faith makes settlement with some third person, the source of the money used to effect the settlement is immaterial to the insurer and cannot be inquired into, and that the payment may be made with borrowed money is no defense."

Implicit in both the *Gibbs* and *Hoffine* decisions was the recognition by this court of the validity of a loan receipt agreement between a contingently liable insurance carrier and an insured, permitting the insured to sue a third party in his own name. The case at bar bears close analogy.

Millers' Mutual contends the loan receipt is invalid as being merely a disguise for subrogation and that Hiebert is not the real party in interest. We believe that what we have already said is sufficient to dispose of this contention. However, we should like to add on this point two further citations. In *Clow v. National Indemnity Co.*, 54 Wn. 2d 198, 202, 339 P. 2d 82, the Washington Supreme Court said:

". . . If the 'loan' was intended as payment, the insurer becomes subrogated to the rights of the insured against third parties; if it were actually intended as a loan, the insurer is not subrogated and the action may be brought by the insured. . . ."

In *Young v. Drive-It-Yourself, Inc.*, 115 Ohio App. 307, 20 Ohio Op. 2d 380, 184 N. E. 2d 912, the Ohio court expressed itself in this language:

"We are sensible of the difficulty of avoiding the apparent import of the loan agreement which may appear to divest plaintiff of his interest in the case, but we are not free to ignore the distinction made by the Supreme Court between a situation where the paying or lending insurer has absolute liability and one where the liability is contingent, excess or undetermined." (p. 312.)

The crux of the matter seems to be that where liability is contingent, as here, payment of funds to an insured under a loan receipt arrangement is not intended by the parties as a discharge of legal liability but rather as a loan, even though repayment be conditional, and the insured retains his right of action against a third party.

Millers' Mutual speaks of Travelers as a mere volunteer in its payment to Hiebert, and cites *Old Colony Ins. Co. v. Kansas Public Ser. Co.*, 154 Kan. 643, 121 P. 2d 193, as supporting the proposition that subrogation may not be invoked in favor of a volunteer. We do not question the decision in that case but its facts are in no way comparable to the case at hand.

In this connection, the defendant points out that Hiebert did not execute the loan receipt until March 12, 1971, ten days after the court determined that he was not acting within the scope of his employment when the homicide occurred. This argument assumes that no settlement agreement had been reached between Travelers and the Young heirs prior to the court hearing. It also overlooks practical realities. Obviously, a settlement must have been reached before being submitted for court approval. The journal entry in the Young case recites that the parties announced the court might enter an agreed judgment. The submission of an agreed judgment to be entered is hardly possible in the absence of prior agreement. While we have no verbatim record of the announcement made to the court we doubt not that the agreement which had been made obligated Travelers to advance Hiebert $25,000 to pay the judgment in return for his loan receipt.

The following statement appears in Hiebert's brief: "The situation is not altered by the fact that after a compromise settlement was agreed upon the court made findings favorable to Travelers at the settlement hearing. It could not then renege on its commitment." On oral argument Hiebert's counsel asserted,

without refutation, that while payment was made after the judgment was entered it had been agreed beforehand that Travelers would pay $25,000 if such be approved by the court. It flies in the face of common sense to suggest that Travelers was a volunteer. The entire process—negotiation, settlement, approval of the court, entry of judgment, payment of the negotiated sum, and execution of loan receipt—was "one integrated ball of wax" so to speak. Millers' Mutual adamantly refused to participate in defending the lawsuit against Hiebert as well as in settlement negotiations, although entreated to do both, and if it now finds itself on the horns of a dilemma it may not be inaccurate to say that this result has stemmed from its own obduracy.

What we hold today is not inconsistent or in conflict with our decision in *Cullen v. Atchison, T. & S. F. Rly. Co.,* 211 Kan. 368, 507 P. 2d 353. The loan receipt in *Cullen* ran to the insurance carrier of one of two alleged joint tortfeasors, bringing up questions relating to contribution and indemnity between joint tortfeasors and placing that case in a posture quite different from that of the present lawsuit.

In brief, the facts in *Cullen* were these: Richard Cullen was killed in a collision between a car in which he was a passenger and a Santa Fe train. Negligence was charged against both the driver of the car, insured by State Farm Mutual Insurance Company, and the railway company. State Farm negotiated a settlement with the guardian of Cullen's minor heirs and took his loan receipt which included as a part thereof an agreement not to sue State Farm or ·its policyholder. The guardian thereupon filed a wrongful death action against the Santa Fe. Santa Fe filed a motion to dismiss on the ground, among others, that the action was based on a loan receipt agreement which violated public policy.

This court agreed that both contribution and indemnity were involved and to the extent that enforcement of the loan receipt would frustrate our rules prohibiting contribution between joint tortfeasors and indemnity between tortfeasors in *pari delicto,* the loan receipt would not be given effect. We did, however, uphold the instrument as a covenant not to sue.

Joint tortfeasors form no part of the present picture; the disputants in this lawsuit are insurance carriers disagreeing as to which of them is liable to respond in damages for the transgressions of a single tortfeasor, who is an insured of each carrier under differing

conditions. Our *Cullen* decision was closely tied to the facts of that case and was not intended to deny the validity of a loan receipt transaction in a proper setting. This was made clear by language appearing in the opinion on pages 377, 378:

"Appellee State Farm cites many cases from other jurisdictions in which the use of loan receipts has been fully upheld but for a number of reasons they supply no precedent here. We will attempt no case by case analysis but generally they present different factual postures from that at bar or turn on rules respecting contribution and indemnity different from our own. Most often they involve situations where an insurance carrier having subrogation rights is seeking complete recoupment of a loss paid by it and the loan receipt permits such recovery without the necessity of suit by the carrier in its own name and at the same time the injured person is, without undue delay, put in funds satisfying his loss. The issue most often raised is whether the loan receipt evidences a true loan or payment . . . We have no quarrel with the decisions cited by appellees nor with the efficacy of a loan receipt in an appropriate case but as has been stated in discussing the device of a loan receipt used in an attempt to thwart a particular rule against indemnity: '. . . the use of a legal device, proper in its setting, should not be extended to a situation foreign to its nature for the purpose of thwarting the decisions of the courts.' (95 U. of Pa. L. Rev. 234.)"

We also noted that *Hoffine v. Standard Ins. Co.,* supra, provided no precedent to be followed in the *Cullen* case, since the issues present in the two cases were not the same. Similarly, the *Cullen* decision has no precedental value in this case, because of factual differences

We find no public policy flaw in this loan receipt agreement as it applies to the facts of this case. We view the transaction as having been entered into with the understanding that the money was advanced by Travelers, not in payment of a fixed or absolute obligation, but in settlement of a contingent and uncertain liability. In such respect we deem the transaction a valid loan, not a sham or deception.

Application has been made by plaintiff for allowance of counsel fees for legal services rendered in this appeal. After due consideration the application is granted and a fee of $1500 will be allowed.

We find no error in the judgment entered in the court below and the same is affirmed.