**T.S.I. HOLDINGS, INC., and New Progress, Inc., Plaintiffs,**

v.

**John C. BUCKINGHAM and Cincinnati Insurance Company, Defendants.**

No. 94–2147–JWL.

United States District Court, D. Kansas.

April 6, 1995.

William W. Humphrey, III, Rose, Brouillette & Shapiro, P.C., Kansas City, MO, for plaintiffs.

Timothy J. Sear, Polsinelli, White, Vardeman & Shalton, Overland Park, KS, for John C. Buckingham.

Robert F. Rowe, Jr., McAnany, Van Cleave & Phillips, P.A., Lenexa, KS, Victor C Peters, Nancy K Tordai, Keith B Daniels, Jr., Hanson & Peters, Chicago, IL, Terri Savely Bezek, Olathe, KS, for Cincinnati Ins. Co.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

This case involves claims brought by plaintiffs T.S.I. Holdings, Inc. ("TSI") and New Progress, Inc. ("New Progress") against defendants John C. Buckingham and Cincinnati Insurance Company ("Cincinnati"). New Progress is a wholly-owned subsidiary of

TSI. Defendant Buckingham was president of TSI and New Progress and also a director of New Progress. The various claims arise out of the plaintiffs' contentions that defendant Buckingham, through his positions at TSI and New Progress, wrongfully appropriated monies from the companies for his own personal use. Counts I–IV of the complaint consist of breach of fiduciary duty claims, a breach of promissory note claim, and a RICO claim by plaintiffs against defendant Buckingham. Plaintiffs' claims against defendant Buckingham are currently stayed due to the fact that he has filed for bankruptcy.

The focus of this case currently centers on Count V of the plaintiffs' first amended complaint. Count V is a breach of insurance contract claim by New Progress against Cincinnati. Effective September 30, 1991, Cincinnati issued a Commercial Crime Insurance Policy covering New Progress for losses occurring from employee dishonesty. On September 17, 1992, New Progress filed a Proof of Loss with Cincinnati in the amount of $230,111.73, which amount it claimed as damages arising out of Mr. Buckingham's actions. Cincinnati subsequently denied coverage under the policy. In Count V, New Progress seeks recovery from Cincinnati under the policy in the amount of the $200,000 policy limit. New Progress also seeks a determination that it is entitled to recover its reasonable attorney's fees in connection with the action pursuant to Section 155 of the Illinois Insurance Code due to Cincinnati's vexatious and unreasonable handling of its claim.

This matter is currently before the court on a number of dispositive and procedural motions. The dispositive motions include New Progress' motion for partial summary judgment as to Cincinnati's third affirmative defense (Doc. # 40), which deals with Cincinnati's defense that New Progress is not the proper party to bring this action. Also pending are Cincinnati's motion for summary judgment on Count V of the first amended complaint (Doc. # 66) and New Progress' Motion for partial summary judgment on

Count V of its first amended complaint (Doc. # 62). While not denominated as cross-motions for summary judgment, these two motions discuss the same issues will be treated as if they were cross-motions by the court.

In addition to the dispositive motions, the parties have filed a plethora of motions to strike various testimony and evidence offered in conjunction with the summary judgment motions. These various motions to strike include: Cincinnati's motion to strike the affidavits and statements submitted by New Progress in support of its motion for partial summary judgment as to Cincinnati's third affirmative defense (Doc. # 47); New Progress' motion to strike the affidavit of Victor C. Peters submitted in support of Cincinnati's motion for summary judgment (Doc. # 76); New Progress' motion to strike the affidavit of John C. Buckingham (Doc. # 86); and Cincinnati's motion to strike the affidavit of H.J. Nichols, the exhibit attached thereto, and paragraph 42 of New Progress' statement of additional material facts submitted in opposition to Cincinnati's motion for summary judgment (Doc. # 91).[1]

For the reasons set forth below, the court finds that New Progress is the proper party to bring this action. Accordingly, New Progress' motion for partial summary judgment as to Cincinnati's third affirmative defense (Doc. # 40) is granted. The court further finds that defendant Buckingham was not an "employee" of New Progress as that term is defined in the Cincinnati Policy. Accordingly, Cincinnati's motion for summary judgment on Count V of the first amended complaint (Doc. # 66) is granted and New Progress' Motion for partial summary judgment on Count V of its first amended complaint (Doc. # 62) is denied. The court further finds that the evidence contested in the various motions to strike filed by the parties was not relevant to the court's ruling on the summary judgment motions and those motions to strike are therefore denied as moot.

---

1. Cincinnati has additionally filed a motion for leave to file a sur-reply in opposition to New Progress' reply to Cincinnati's objection to New Progress' motion for summary judgment (Doc. # 99). Because the issue addressed in Cincinnati's sur-reply was brought up for the first time in New Progress' reply, the court finds that Cincinnati's sur-reply should properly be considered and therefore grants Cincinnati's motion for leave to file a sur-reply.

## II. Factual Background

TSI and New Progress are both corporations duly organized and existing according to the laws of the state of Kansas. TSI is a holding company for a number of different subsidiaries, including New Progress, which is wholly-owned by TSI. New Progress is a manufacturer of refined fuel tank trucks.

John Buckingham was hired by TSI in June of 1991 to be its president and to oversee several of the subsidiaries of TSI, including New Progress. As president of TSI, Mr. Buckingham was responsible for the financial affairs of all of TSI's subsidiaries, and the financial structure of TSI as a whole. Essentially, Mr. Buckingham was responsible for preparing the consolidated financial return of the various subsidiary corporations for TSI.

Mr. Buckingham also held the positions of vice president and secretary of New Progress from July 2, 1991 to January 13, 1992, and president of New Progress from January 14, 1992 to July 9, 1992. From July 1, 1991 to July 9, 1992, Mr. Buckingham was also a director of New Progress. Mr. Buckingham was perceived at all times by the New Progress people reporting to him to be the chief executive officer of that corporation. Mr. Buckingham was responsible for running the day-to-day operations of New Progress and his work involved overseeing New Progress' organization, management, production, profitability, union relations, hiring, firing and all other functions that a typical president of a corporation would do. In addition, Mr. Buckingham performed work for several other subsidiaries of TSI.

In addition to Mr. Buckingham, the New Progress Board of Directors consisted of Steven Paul, Melvyn Paul, and Philip Hodes. The bylaws of New Progress provide that the directors are responsible for managing the business and affairs of the corporation. The parties dispute the actual amount of control and direction the directors had over Mr. Buckingham's work. Cincinnati contends that the board of directors of New Progress never instructed or directed Mr. Buckingham to undertake or perform any specific work for New Progress and in fact did nothing to direct or control Mr. Buckingham's work.

New Progress, on the other hand, contends that the New Progress board of directors met frequently to discuss various issues relating to the corporation, and that the directors, as a whole, told Mr. Buckingham what to do with respect to New Progress.

When it was time for Mr. Buckingham to be paid, he received all of his pay from TSI by means of a paycheck that was issued to him by TSI. Additionally, Mr. Buckingham's W–2 form was issued by TSI. In turn, TSI's subsidiaries, including New Progress, would pay a management fee to TSI which was used to pay the salaries or portions of salaries of people who were doing work on their behalf. The management fee New Progress paid to TSI included reimbursement for services rendered to New Progress by Mr. Buckingham and others who split their time between New Progress and other TSI subsidiaries.

During the period from October 18, 1991 through July 7, 1992, New Progress was the named insured under a Commercial Crime Insurance Policy, policy number CAP 786 72 07, issued by Cincinnati (the "Cincinnati Policy"). The Cincinnati Policy provides that Cincinnati will pay for losses resulting directly from "employee dishonesty" as that term is defined in the Cincinnati Policy.

New Progress contends that from approximately October 18, 1991 through July 7, 1992, Mr. Buckingham improperly instructed that checks be drawn on the New Progress corporate bank account in the aggregate amount of $199,701.99 to pay for his own personal expenses and to provide cash for his personal use. New Progress also contends that during this period Mr. Buckingham also improperly used a New Progress American Express card to pay for his own personal expenses, which card had an unpaid balance of $30,409.74 on July 7, 1992. Cincinnati, on the other hand, contends that Mr. Buckingham did have the authority to use the checks and credit card in the manner he did, and that Mr. Buckingham had authorization to use the monies for personal expenses on the understanding that he would repay the monies to New Progress out of his year-end bonus. Cincinnati further disputes the

amount alleged by New Progress to have been spent by Mr. Buckingham on personal matters.

On September 17, 1992, New Progress filed a proof of loss with Cincinnati in the amount of $230,111.73, which amount it claimed as damages resulting from Mr. Buckingham's conduct. Cincinnati subsequently denied coverage of New Progress' claim under the Cincinnati Policy.

Also during the period from October 18, 1991 through July 7, 1992, TSI and its subsidiaries were the named insureds under another Crime Insurance Policy, policy no. 81319527–A, which was issued by the Federal Insurance Company (the "Federal Policy"). On August 24, 1992, TSI filed a Proof of Loss with Federal arising out of Buckingham's actions. On April 23, 1993, Federal "loaned" to TSI and New Progress the sum of $216,-000.00, which was memorialized by a Loan Receipt and Trust that was executed by TSI and New Progress (the "Loan Receipt"). The Loan Receipt described the $216,000.00 payment as "a loan without interest (not a payment) repayable only in the event and to the extent of any recovery TSI and/or New Progress ... may make from any persons, corporations, insurance companies, or other parties causing or liable for any losses resulting from the defalcation of John C. Buckingham...." As security for the "loan," New Progress pledged all their claims against any persons and further agreed to hold for Federal any monies recovered in trust and to remit said monies to Federal upon request. New Progress further agreed to prosecute suit against any persons liable for the loss, such suit to be at the sole expense of Federal.

### III. Summary Judgment Standards

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir. 1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United*

*States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

### IV. Discussion

■ 1. *New Progress' Motion for Partial Summary Judgment on Cincinnati's Third Affirmative Defense (Doc. # 40)*

In this motion, New Progress seeks partial summary judgment on Cincinnati's third affirmative defense set forth in its answer to the first amended complaint. Cincinnati's third affirmative defense provides as follows:

New Progress has recovered the full amount of any loss it may have incurred as a consequence of Buckingham's conduct from either TSI or Federal Insurance Company under Crime Insurance Policy No. 81319527–8 (hereinafter the "Federal Policy"), and therefore New Progress has sustained no loss and is not the proper party to bring this action.

In its third affirmative defense, Cincinnati contends that New Progress is not the real party harmed by any wrongful activity in which Cincinnati may have engaged. Cincinnati argues that the monies received by New

Progress through the loan receipt were not in fact a loan, rather they were a payment under the Federal Policy of the full amount of the loss New Progress may have sustained. Accordingly, Cincinnati urges that the loan receipt should be dismissed as a sham and that therefore, under Fed.R.Civ.P. 17(a), Federal is the real party in interest in this action and New Progress cannot properly bring the action. New Progress on the other hand, contends that the Loan Receipt should, in fact, be construed as a loan pursuant to its express terms. In that event, New Progress argues, New Progress has not recovered from Federal the full amount of the losses it sustained as a result of Buckingham's conduct, and New Progress is therefore the proper party to bring this action under Fed.R.Civ.P. 17(a).

A loan receipt is an arrangement under which an insurer advances an amount of money to its insured as a loan, which loan is repayable only in the event and to the extent of any net amount recovered by that insured from a third party. Couch On Insurance 2d, Section 61:75 (1983). Technically, the insurer is not the real party in interest, since it has not paid the insured's claim and therefore is not subrogated to his rights. Thus, the question created for the court is whether, under a loan receipt situation, the insurer may sue in the name of its insured. As one commentator has stated:

> Whether the insurer may sue in the name of its insured under a loan-receipt arrangement depends on whether the court is willing to accept the transaction at face value, either on the basis of its own evaluation of the transaction or in terms of state law in diversity cases. If the loan is treated as genuine, there is no basis for subrogation and the action may be brought in the insured's name. But, if the court views the loan as a sham and as actually constituting payment of the insured's claim, then the insurer is subrogated and must sue in its own name. When the loan-receipt arrangement is sanctioned by state law, however, the courts have accepted the characterization the parties have given to

their transaction and have held the insured to be the real party in interest.

6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1546.

There is a great split of authority among the various federal courts as to the validity of loan receipt agreements.[2] However, in the only Tenth Circuit opinion to address the issue, the circuit court stated that it considered the Supreme Court decision in *Luckenbach v. W.J. McCahan Sugar Refining Co.,* 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918) to be dispositive and thus held that a "loan receipt" was effective as such and did not displace the insured as the real party in interest under Rule 17(a). *R.J. Enstrom Corp. v. Interceptor Corp.,* 520 F.2d 1217 (10th Cir.1975). The court then addressed the question of whether or not the receipt evidenced an outright payment by the carrier to the insured on the policy and accomplished subrogation. The court found that this was a question of substantive law and, since the applicable state law recognized the validity of loan receipts as loans, the court held that the loan receipt was valid and the insured remained the real party in interest under Rule 17(a). *Id.* at 1219–20.

■ The loan receipt in question in this case was executed by the parties in Kansas. Thus, the validity of the loan receipt must be analyzed under Kansas law. *See Civic Associates, Inc. v. Security Ins. Co. of Hartford,* 749 F.Supp. 1076, 1079 (D.Kan.1990). The Supreme Court of Kansas has recognized the validity of loan receipts and the consequent propriety of an action against a third party that is brought in the name of the insured pursuant to such a document. *See Hiebert v. Millers' Mutual Ins. Ass'n of Illinois,* 212 Kan. 249, 510 P.2d 1203 (1973). Accordingly, the court finds that New Progress is the proper party to assert this action against Cincinnati. New Progress' motion for partial summary judgment as to Cincinnati's third affirmative defense is therefore granted.

*2. Motions for Summary Judgment filed by Cincinnati and New Progress (Doc. # s 62 and 66)*

---

**2.** *See* 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1546 footnotes 10 and

11 for a listing of courts treating loan receipts as genuine and those treating them as a sham.

While not denominated as cross-motions for summary judgment, both Cincinnati and New Progress seek summary judgment on Count V of the First Amended Complaint in their motions, and both motions discuss the same issues. Accordingly, the court will address the arguments made in both motions in this section of its decision.

■ The key question for this court to address regarding the parties' summary judgment motions is whether John Buckingham was an employee of New Progress as defined in the Cincinnati Policy. The Cincinnati Policy provides that Cincinnati will pay New Progress for any loss resulting from "Employee Dishonesty." The policy defines an "employee" as follows:

1. "Employee" means:

   a. Any natural person:

   (1) While in your service (and for 30 days after termination of service); and

   (2) Whom you compensate directly by salary, wages or commissions; and

   (3) Whom you have the right to direct and control while performing services for you.

   b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the "premises".

   But "employee" does not mean any:

   (1) Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

   (2) Director or trustee except while performing acts coming within the scope of the usual duties of an employee.

"In interpreting a contract of insurance the general rule is that where the provisions of a policy are clear and unambiguous, it is the duty of the court to enforce them according to their plain meaning." *Thornton v. Illinois*

*Founders Ins. Co.*, 84 Ill.2d 365, 49 Ill.Dec. 724, 727, 418 N.E.2d 744, 747 (1981); *Hanover Ins. Co. v. Showalter*, 204 Ill.App.3d 263, 149 Ill.Dec. 534, 561 N.E.2d 1230 (1 Dist., 1990); *Allstate Ins. Co. v. Gutenkauf*, 103 Ill.App.3d 889, 59 Ill.Dec. 525, 431 N.E.2d 1282 (1 Dist., 1981).[3] "The insurance contract should be read as a whole in order to determine whether an ambiguity exists, and the court should not search for an ambiguity where there is none." *Allstate, supra*, 59 Ill.Dec. at 529, 431 N.E.2d at 1286, *citing United States Fire Ins. Co. v. Schnackenberg*, 88 Ill.2d 1, 57 Ill.Dec. 840, 429 N.E.2d 1203 (1981). Contract terms are not ambiguous simply because the parties do not agree on their meaning. *Hanover, supra* at 149 Ill.Dec. 534, 561 N.E.2d 1230. Illinois courts have consistently recognized that "insurance policies are to be liberally construed in favor of coverage and where an ambiguity exists in the terms, the ambiguity will be resolved in favor of the insured and against the insurer." *Jones v. Universal Cas. Co.*, 257 Ill.App.3d 842, 196 Ill.Dec. 397, 401, 630 N.E.2d 94, 98 (1 Dist., 1994), *citing State Sec. Ins. Co. v. Burgos*, 145 Ill.2d 423, 164 Ill.Dec. 631, 583 N.E.2d 547 (1991). Thus, "[w]hen an insurance policy is ambiguous, the insured shall be deemed covered." *Id., citing Shelton v. Country Mut. Ins. Co.*, 161 Ill.App.3d 652, 113 Ill.Dec. 426, 515 N.E.2d 235 (1 Dist., 1987). An insurance policy provision is ambiguous if it is "subject to more than one reasonable interpretation" when reading the policy as a whole. *Id., citing State Farm Mut. Auto. Ins. Co. v. Pfannebecker*, 64 Ill. App.3d 582, 21 Ill.Dec. 469, 381 N.E.2d 796 (5 Dist., 1978). The determination of ambiguity may be made as a matter of law, but not "in a factual vacuum"; among other factors, "the court should consider the predominate purpose of the contract which is to indemnify the insured." *Id., citing Illinois Central Gulf R.R. v. Continental Cas. Co.*, 132 Ill.App.3d 310, 87 Ill.Dec. 274, 476 N.E.2d 1266 (1 Dist., 1985).

In order to show that Mr. Buckingham is a covered employee under the Cincinnati Poli-

---

**3.** The parties agree that the Cincinnati Policy was executed in Illinois and that the law of Illinois is therefore controlling in interpreting the contract provisions. *See Civic Associates, Inc. v. Security Ins. Co. of Hartford*, 749 F.Supp. 1076, 1079 (D.Kan.1990).

cy, New Progress must prove that Mr. Buckingham satisfied each of the following three elements contained in the Policy's "employee" definition: (1) Mr. Buckingham was in the service of New Progress; (2) New Progress compensated him directly by salary, wages or commissions; and (3) New Progress had the right to direct and control Mr. Buckingham while he performed services for New Progress.

The parties agree that Mr. Buckingham satisfies the first element of the Policy's employee definition in that Mr. Buckingham was indeed in the service of New Progress. It is on the second element that the parties have vigorously locked horns. The second element requires that New Progress "compensate directly by salary, wages or commissions" Mr. Buckingham. Cincinnati argues that because Mr. Buckingham received his paycheck from TSI, he was not "compensated directly" by New Progress. New Progress, on the other hand, argues that despite the fact that Mr. Buckingham received his salary from TSI, he was in fact directly compensated by New Progress as that term is used in the "employee" definition.

With the relevant Illinois contract interpretation law in mind, the court now turns to the interpretation of the term "compensate[d] directly." The term is not defined in the Cincinnati Policy. Therefore, the court must interpret this term by affording it its plain, ordinary and popular meaning. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 702, 607 N.E.2d 1204, 1215 (1992). The Illinois Supreme Court has relied on the following authority in describing what is meant by the concept of plain and ordinary meaning:

> Usual and ordinary meaning has been stated variously to be that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal [person], to a reasonable [person], to persons with usual and ordinary understanding, to a business [person], or to a lay [person].

*Id.*, 180 Ill.Dec. at 703, 607 N.E.2d at 1216, *citing* 2 Couch on Insurance 2d § 15:18 (rev. ed. 1984).

In determining the plain and ordinary meaning to be ascribed to terms that are not defined in an insurance policy, Illinois courts have examined and considered their dictionary definitions. *See Outboard Marine Corp.*, 180 Ill.Dec. at 703, 607 N.E.2d at 1216; *Hanover*, 149 Ill.Dec. at 535, 561 N.E.2d at 1231; *Allstate*, 59 Ill.Dec. at 528, 431 N.E.2d at 1285. "Directly" is defined as follows:

> **2 c:** without divergence from the source or the original * * * **4 a:** without any intervening agency or instrumentality or determining influence * * * **5 a:** in independent action without any sharing of authority or responsibility * * *

Webster's Third New International Dictionary 641 (1986).[4]

The court finds that the undisputed facts of this case demonstrate that New Progress did not directly compensate Mr. Buckingham. Mr. Buckingham performed work for TSI and several subsidiaries of TSI other than New Progress. His total salary was paid by a TSI check each month. It is true that a portion of the monies paid to Mr. Buckingham came from funds received by TSI from New Progress pursuant to a management fee, which included as a component work done by Mr. Buckingham for New Progress. However, it is not reasonable to maintain, as New Progress does in this case, that the payment of a management fee from New Progress to TSI constitutes "direct compensation by salary or wages" to Mr. Buckingham. Certainly, within the plain and ordinary meaning of the word "directly," such payments are not "without divergence from the source" or "without any intervening agency or instrumentality." Simply, under the plain and ordinary meaning of the term, Mr. Buckingham was compensated directly by TSI, not New Progress. To determine otherwise would require an unreasonable and illogical construction of the Policy language.

New Progress argues that the meaning and effect of the "compensate[d] directly"

4. Similarly, the Webster's New Collegiate Dictionary, 10th Edition (1993) defines "direct" as "in a direct way: as a: from point to point without deviations; by the shortest way; b: from the source without interruption or diversion; c: without an intervening agency or step."

language is ambiguous, and therefore must be construed in its favor. However, an ambiguity can exist only when the policy terms are "capable of being understood in more sense than one," when those terms are "obscure in meaning, through indefiniteness of expression, or [have] a double meaning." *See Gardiakos v. Vanguard Communications,* 38 Ill.App.3d 937, 350 N.E.2d 210 (1 Dist.,1976). In this case, the court finds that the term "compensate[d] directly," given its plain and ordinary meaning, is not ambiguous. The plain language of the policy requires that to qualify for coverage as an "employee," the employee must receive his or her salary, wages and/or commissions directly from New Progress. This did not occur.

In further support of its argument that the policy term is ambiguous, New Progress submits an affidavit from H.J. Nichols which includes an attachment denominated as a "Report of Subcommittee for the Revision of Commercial Forms." New Progress contends that the report supports the proposition that the inclusion of the word "directly" into the provision addressing compensation was inserted only to eliminate the possibility that employees of subcontractors and independent contractors might arguably fall within the provisions of the form crime insurance policy. However, the court finds that, as a matter of law, the proposed submissions by New Progress cannot explain, expand or vary the meaning of the Policy because parole evidence may not be used to vary the meaning of the unambiguous Policy terms. *See W.H. Lyman Const. Co. v. Village of Gurnee,* 131 Ill.App.3d 87, 86 Ill.Dec. 276, 284, 475 N.E.2d 273, 280 (2 Dist., 1985).

New Progress additionally argues that Mr. Buckingham should be found to have been a covered employee under the Policy based upon statements and definitions contained in application forms prepared by New Progress when the Policy was procured.

New Progress claims that the application forms show that: (1) New Progress and Cincinnati intended Mr. Buckingham to be a covered employee; and (2) the fact that the word "directly" does not appear in the application's definition of an employee makes the Policy language, which contains the word "directly" in its employee definition, ambiguous. However, the court finds that, as a matter of law, New Progress cannot rely on its application papers to dispute the unambiguous terms of the Policy. When an insurance policy is issued which makes the application for insurance part of the policy, the application becomes and is construed as part of the entire insurance contract. *A.D. Desmond Co. v. Jackson Nat. Life Ins. Co.,* 223 Ill.App.3d 616, 166 Ill.Dec. 98, 585 N.E.2d 1120 (2 Dist., 1992). However, the general rule is that where the application has not been incorporated or made a part of the policy by proper and sufficient reference, matters contained therein are of no consequence in determining the rights of the parties under the contract. *See* 13A John Appleman and Jean Appleman, Insurance Law and Practice § 7575 (1976). Further, whether the application for insurance is a part of the policy is to be determined only from the language of the policy, and the application cannot be considered on that question. *See Spence v. Central Accident Ins. Co.,* 236 Ill. 444, 86 N.E. 104 (1908). Because the application is not referenced in the policy, and the court has found the language of the policy to be unambiguous, reference to the application is not proper.

The next question to be analyzed by the court is whether Mr. Buckingham qualifies as an "employee" under the Cincinnati Policy because he was a director performing acts coming within the scope of the usual duties of an employee. Analysis of this issue requires a careful reading of the Policy language defining employees.[5]

---

5. For reasons of clarity, the definition under the Policy is set forth again here:

C. GENERAL DEFINITIONS
1. "Employee" means:
  a. Any natural person:
    (1) While in your service (and for 30 days after termination of service); and

    (2) Whom you compensate directly by salary, wages or commissions; and
    (3) Whom you have the right to direct and control while performing services for you.
  b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, how-

New Progress argues that the language contained in § C.1.b.(2) of the Cincinnati Policy creates a separate definition of an employee, which Mr. Buckingham satisfies because he was a director of New Progress who was performing acts within the scope of the usual duties of an employee. Cincinnati, on the other hand, argues that § C.1.b.(2) provides coverage only to a director who *as a director* is performing acts within the scope of the usual duties of an employee. Cincinnati argues that Mr. Buckingham is not covered under the subsection because he did not undertake any acts within the scope of the usual duties of an employee while acting in his capacity as a director; rather, those acts were undertaken in his capacity as an officer of TSI and New Progress.

The court finds that both parties have incorrectly interpreted the effect of § C.1.b.(2). A careful analysis of the language leads to the conclusion that the subsection does not create a separate category of defined "employees," rather, the subsection merely qualifies the definitions set forth under subsections a. and b. Subsection a. sets forth a definition of an "employee" as any natural person meeting the three requirements set forth under subsection a. Subsection b. sets forth a definition of an employee as any natural person employed by an employment contractor meeting the other requirements under subsection b. The language contained in § C.1.b.(2), on the other hand, is not set forth as a separate definition of an "employee." To be such a separate definition, it would need to be set forth as a separate subsection (presumably, it would be set forth as subsection c.). Rather, the language contained in § C.1.b.(2) follows the qualifying language "But 'employee' does not mean any:" Accordingly, the court finds that the proper way to interpret the language of § C.1.b.(2) is not that it sets forth a separate definition for an "employee," but rather that

it qualifies the definitions of "employee" which precede it.[6] Because the qualifying language is set forth under subsection b., a possible interpretation would be that the language of § C.1.b.(2) applies only to that subsection. However, such a limited interpretation does not make much sense. The court believes the more likely interpretation is that the qualifying language of § C.1.b.(2) was meant to apply to the definitions under both subsections a. and b. Even under this favorable interpretation, Mr. Buckingham does not qualify as an insured "employee." He fails to qualify under § C.1.a. because he was not directly compensated by New Progress and he fails to qualify under C.1.b. because he was not employed by an employment contractor. Accordingly, the court finds that the language of § C.1.b.(2) does not operate to bring Mr. Buckingham within the definition of an "employee" covered by the Policy.

■ Even if the court were to agree with the parties' interpretation that § C.1.b.(2) creates a separate category of defined "employees," the court finds that Mr. Buckingham would not fall within that category. The court agrees with Cincinnati's contention that the limiting language "while performing" indicates that the director would have to be acting in his or her capacity as a director when undertaking the acts usually performed by an employee. New Progress claims in this case that Mr. Buckingham fraudulently requisitioned and authorized checks and made improper charges for the payment of personal expenses. The request and authorization of corporate expenditures falls within the scope of the duties and responsibilities of an officer of New Progress. Accordingly, because Mr. Buckingham was acting as an officer, rather than a director, when the actions allegedly warranting coverage were undertaken, § C.1.b.(2) would not apply.

ever, any such person while having care and custody of property outside the "premises". But "employee" does not mean any:

(1) Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

(2) Director or trustee except while performing acts coming within the scope of the usual duties of an employee.

6. In other words, the language in § C.1.b.(2) does not create a separate category of "employees." Rather, its effect is to limit those who would otherwise qualify as employees under subsections a. and b.

■ Count V of the Amended Complaint also alleges that Cincinnati violated Section 155 of the Illinois Insurance Code. Ill.St.Ch. 215 § 5/155. Section 155 permits the recovery of attorneys' fees and an additional specified award in situations involving actions against an insurance company wherein there is an issue of liability of a company on a policy of insurance and the company's failure to pay under the claim or delay in paying the claim is found to be vexatious and unreasonable.[7] The denial of a claim does not, as a matter of law, constitute vexatious and unreasonable conduct if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; or (2) the insurer asserts a legitimate policy defense; or (3) the claim presents a genuine legal issue regarding coverage; or (4) the insurer takes a reasonable position on an unsettled issue of law. *See Green v. International Ins. Co.*, 238 Ill.App.3d 929, 179 Ill.Dec. 111, 605 N.E.2d 1125 (2 Dist., 1992); *Cummings Foods, Inc. v. Great Central Ins. Co.*, 108 Ill.App.3d 250, 64 Ill.Dec. 108, 439 N.E.2d 37 (4 Dist., 1982); *Lazzara v. Howard A. Esser, Inc.*, 622 F.Supp. 382 (N.D.Ill.1985); *Martz v. Union Labor Life Ins. Co.*, 573 F.Supp. 580 (N.D.Ill.1983).

Due to the fact this court has found that Mr. Buckingham was not a covered employee as defined by the Cincinnati Policy, it naturally follows that Cincinnati's denial of New Progress' claim was not vexatious and unreasonable. Further, even had the court found that Mr. Buckingham was a covered employee under the Policy, in considering the totality of the circumstances present in this case, the court finds that a bona fide dispute concerning insurance coverage existed and that Cincinnati's actions in denying the claim would not have been vexatious and unreason-

able. Accordingly, Cincinnati's motion for summary judgment as to that portion of Count V is granted.

There are two other issues addressed in the parties' competing motions for summary judgment which the court finds are not ripe for summary judgment at this time. The first of these is Cincinnati's contention that New Progress did not have the "right to direct and control" the activities of Mr. Buckingham as required under § C.1.a.(3) of the Cincinnati Policy. The court finds that questions of material fact regarding this issue prevent summary judgment in favor of either party on this issue at this time.

■ The other issue addressed in the parties' summary judgment motions is Cincinnati's assertion that the "other insurance" clause contained in the Cincinnati Policy precludes New Progress from any recovery from Cincinnati. Section A.11. of the Cincinnati Policy provides that:

This insurance does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance is insufficient to cover the entire amount of the loss, this insurance will apply to that part of the loss, other than that falling within any deductible amount, not recoverable or recovered under the other insurance or indemnity.

Cincinnati argues that the payment made by Federal pursuant to the Loan Receipt constituted payment by Federal of New Progress' entire claim. Accordingly, Cincinnati contends that because New Progress has recovered the entire amount of its loss from Federal, the excess clause contained in Section A.11. of the Cincinnati Policy precludes

---

7. Section 155 provides that:
    In any action by or against a company wherein there is in issue the liability of a company on policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
(b) $25,000;
(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

any recovery by New Progress against Cincinnati.

The court finds that the "other insurance" clause in the Cincinnati Policy would not operate to relieve Cincinnati of liability even if the payment of $216,000 to New Progress pursuant to the Loan Receipt were interpreted to be full payment to New Progress for its entire claim. This is because the Federal Policy, like the Cincinnati Policy, also contains an excess insurance clause. In cases where an insured has two policies, both of which provide excess coverage, Illinois follows the general rule that the excess provisions cancel each other, and the liability is divided equally among the insurance carriers. *See Continental Nat. America Ins. Co. v. Aetna Life and Cas. Co.,* 186 Ill.App.3d 891, 134 Ill.Dec. 608, 542 N.E.2d 954 (1 Dist., 1989); *Continental Cas. Co. v. Travelers Ins. Co.,* 84 Ill.App.2d 200, 228 N.E.2d 141 (1967). Accordingly, the court finds that the "other insurance" clause contained in the Cincinnati Policy would not relieve Cincinnati from liability and Cincinnati's motion for summary judgment as to that issue is denied.

## V. Conclusion

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** New Progress' motion for partial summary judgment as to Cincinnati's third affirmative defense (Doc. # 40) is granted.

**IT IS FURTHER ORDERED THAT** Cincinnati's motion for summary judgment on Count V of the first amended complaint (Doc. # 66) is granted in part and denied in part. Summary judgment is granted as to Count V of the first amended complaint on the grounds that Mr. Buckingham was not a covered employee under the "employee" definition contained in the policy. The motion is also granted as to New Progress' claim under Section 155 of the Illinois Insurance Code. The motion is denied as to the alternative grounds for summary judgment set forth in the motion. As a result of the foregoing, the case between the plaintiff and Cincinnati is entirely terminated and the settings for final pretrial conference and for trial are vacated. Also, the parties' respec-

tive objections to witness and exhibit lists (Docs. # 71, 84 and 88) are dismissed.

**IT IS FURTHER ORDERED THAT** New Progress' motion for partial summary judgment on Count V of its first amended complaint (Doc. # 62) is denied.

**IT IS FURTHER ORDERED THAT** Cincinnati's motion to strike the affidavits and statements submitted by New Progress in support of its motion for partial summary judgment as to Cincinnati's third affirmative defense (Doc. # 47); New Progress' motion to strike the affidavit of Victor C. Peters submitted in support of Cincinnati's motion for summary judgment (Doc. # 76); New Progress' motion to strike the affidavit of John C. Buckingham (Doc. # 86); and Cincinnati's motion to strike the affidavit of H.J. Nichols, the exhibit attached thereto, and paragraph 42 of New Progress' statement of additional material facts submitted in opposition to Cincinnati's motion for summary judgment (Doc. # 91); are all denied as moot.

**IT IS FURTHER ORDERED THAT** Cincinnati's motion for leave to file a sur-reply in opposition to New Progress' response to Cincinnati's objection to New Progress' motion for summary judgment (Doc. # 99) is granted.

**IT IS SO ORDERED.**